**WESTERN UNION TEL. CO. v. McDAVITT.**

**No. 10131.**

Court of Civil Appeals of Texas. Austin.

April 15, 1953.

Rehearing Denied May 6, 1953.

Naman, Howell & Boswell, C. Cullen Smith, by Hilton E. Howell, Waco, for appellant.

Saulsbury, Skelton, Everton, Bowmer & Courtney, by Byron Skelton and Jim D. Bowmer, Temple, for appellee.

HUGHES, Justice.

This is a so-called "slip and fall case"[1] in which appellee, Dr. Bertha S. McDavitt, sued Western Union Telegraph Company and another for damages for injuries sustained in a fall in appellant's place of business in Temple, Texas, on or about October 9, 1950.

This case was tried nonjury and judgment in the sum of $7,000 was awarded appellee against Western Union and judgment against its codefendant was denied. Appellee has not appealed from this judgment.

Findings of facts and conclusions of law were made and filed by the trial judge.

Appellant has twenty assignments of error all but one of which relate to the total lack or insufficiency of the evidence to support various findings of the trial court pertinent to issues of negligence, proximate cause and contributory negligence.

We will treat all of these assignments together.

The evidence shows, without dispute, that appellee, a physician 74 years of age, between the hours of 2 P.M. and 4 P.M. on the afternoon of October 9, 1950, entered the downtown office of appellant in Temple for the purpose of sending a telegram.

Immediately inside the entrance of this office there is a reception lobby about 30 feet wide and 15 feet in depth, this lobby being provided for use by and convenience of the customers of appellant. At the rear of such space is a counter designed for use in writing messages by standing customers. Behind this counter are the employees of appellant.

Appellee approached this counter, wrote her message and arranged for its transmission, turned away, picked up a piece of paper from the floor and threw it in a waste basket and turned to go out the door when her feet slipped from under her and she fell to the floor sustaining severe injuries.

The floor was covered with a form of asphalt tile which was laid in 1943. The color of this tile was dark red or maroon.

At the time of her injury appellee was wearing a comparatively new pair of Dickerson shoes, the style she had worn for many years. The shoes had leather heels

1. Baylor Law Review, Vol. V, pp. 161 and 176.

which were a little less than 2 inches high, about an inch and one-half square at the bottom and were not "spike" heels.

The trial judge made the following relevant fact findings:

1. The floor was too slippery for persons to walk on with safety.

2. The floor was maintained with an excessive coat of wax which caused the slippery condition of the floor.

3. The floor was cleaned weekly, the method used was to wash with soap and water, rinse with clear water and then apply Franklin's Liquid Wax No. 21 and that this caused the floor to be slippery by accumulating an excessive amount of wax on the floor.

4. That the use of soap and water on the floor, prior to waxing, removed the slip-retardent qualities of the wax.

5. That appellant failed to follow these instructions written on wax container: "Clean thoroughly with Franklin Rubber Glass Cleaner or other good floor cleaner," and that soap and water were not efficient agents in cleaning wax from the floor.

6. That all of the above findings were negligent and the proximate cause of appellee's injuries.

7. That the shoes appellee was wearing did not contribute to her falling.

8. That the dangerous condition of the floor was not open and obvious to appellee and not so readily apparent to her as that she should have observed it by the use of ordinary care.

9. That appellee did not fail to keep a proper lookout or exercise reasonable care for her own safety.

10. That appellee's injuries were not the result of an unavoidable accident.

■ It is our opinion that these findings are amply supported by the evidence when viewed in a light most favorable to appellee. We will refer to so much of the evidence as is required to sustain this conclusion.

Appellee testified:

"Q. State whether or not after you fell on this floor you observed its con-

dition with reference as to whether or not it had an excessive amount of wax on it? A. When I fell I just had to lie there for a little while. I was on this shoulder and they tried to help me up and I said no, just let me sit here for a minute and I looked around and it was as slick as glass to me.

"Q. And state whether or not it did have an excessive amount of wax on it? A. It did.

* * * * * *

"Q. Doctor, let's skip back for just a few moments to your testimony on yesterday about the occasion when you slipped and fell in the Western Union Office. What happened to your feet when you slipped and fell? A. They just went out from under me.

"Q. Alright, what did they slip on? A. On the floor.

"Q. What did you see and observe and feel after you fell with respect to the condition of the floor there at the place where your feet slipped out from under you? A. The floor was just as slick as wax and I was lying on the floor on my shoulder. My shoulder took the brunt of the fall.

"Q. What appeared to be on the floor at that place? A. It looked like wax to me.

* * * * * *

"Q. Alright, what was the appearance with reference to whether it was shiny or dull? A. Shiny.

"Q. Compare it with any other slick surface you have ever stood on and tell us how it compared. A. Well, if any of you have ever skated on ice, as I grew up on ice, you would know how slick the floor was. It was as slick as the ice I used to skate on.

* * * * * *

"Q. Yes, you didn't notice the floor before you fell, is that right? A. No.

* * * * * *

"A. My hands were on the floor. It was slick.

"Q. Are you now saying that you felt of the floor?

* * * * * *

"Q. You are saying now that you felt it? A. Yes, I did when I was on the floor.

"Q. You are saying that you felt it with your hands? A. Yes.

* * * * * *

"Q. Now what do you mean by an excess of wax? A. Enough so that a person could see it.

"Q. In other words, more wax than you think should have been on the floor, is that right? A. I presume that is what happened.

"Q. In other words, you are saying it is excessive because you fell? Is that right? A. Well, you can see gobs of wax on the floor. I know that I fell, and that the floor was slick.

* * * * * *

"Q. Dr. McDavitt, state whether or not at the time you fell there in the Western Union office your feet slipped on that floor? A. They did and it was just like glass. As I said awhile ago, my feet just slipped right from under me and there. I was on my shoulder."

For several years prior to the time Dr. McDavitt slipped on the floor, the practice of the Western Union Janitor had been to wax the floor once a week, first washing it off with soap and water,[2] then rinsing with clear water, then permitting it to dry, then waxing it with Franklin's 21 wax. The wax was applied by placing it in a bucket with a wringer on it, then dipping a string or rag mop into the bucket, applying foot pressure to the wringer to wring out the mop, and then mopping by running the mop the 8 or 10 feet from the counter to the front of the lobby. The janitor would take three of these long strokes with the mop before dipping it into the wax again. He would then sweep the floor daily with a hair broom before the next waxing day.

The testimony also showed that the floor had been waxed by Western Union's janitor on the Saturday before Dr. McDavitt slipped and fell on Monday and that there was less traffic to wear the wax off the floor on Sunday than on a normal business day and also that there was less traffic to wear the wax off at the side of the office where the appellee fell.

V. A. Westlake, a witness for appellee, qualified as an expert in waxes and testified:

That Franklin's 21 Wax was a water emulsion wax and that the number "21" indicated the percentage of solid contents in the wax, "that the water emulsion waxes in general cannot have any alcohol or petroleum distillates in them because if they do they will dissolve the surface of the asphalt, rubber or floors of that nature, so naturally it is a water type wax and it has the emulsifying agent and a plasticizer as the liquid and into that is emulsified and ground the different waxes that are used," and that the higher the solid content the less plasticizer or nonskid properties there would be and the more slippery the floor would be.

Mr. Westlake further testified that Tide and similar soaps were not considered wax removers and that over an extended period of time, as shown by this record, the use of such cleanser would result in the accumulation of a heavy and excessive coat of wax on the floor covering and that this wax content on the floor would cause the floor to be more slippery. This condition would be aggravated by sweeping with a broom made of hair bristles because this buffing or polishing removes the nonskid agency in the wax.

The proper method of cleaning an asphalt tile floor preparatory to waxing was described by Mr. Westlake as follows:

"Each company puts out with its product an asphalt tile cleaner, which are chemical cleaners, that will remove the plasticizer and also the wax. It is fixed with water, it comes in two forms, both liquid and powder, and that is used to clean up all of the residue of the wax and you are down to your floor, your tile, and you don't get the discoloration which comes from successive coats of wax."

2. For some several months prior to appellee's fall the soap used was "Tide."

The following evidence bears on appellant's contention that the dangerous condition of the floor was open and obvious to appellee and hence that she was guilty of contributory negligence as a matter of law.

Appellee's fall occurred in midafternoon. Her office is next door to appellant's place of business and she had been in its office several times previously. The day was clear and sunlight came through the plate glass windows into the lobby and there were also two 200-watt globe lights burning, one near where appellee fell.

Appellant's janitor testified in speaking of the floor:

"Q. It would just have a sort of dull gloss just like a regular waxed floor did, is that right? A. That's right.

"Q. And not this glassy, over-slippery look? A. No, sir.

"Q. It wouldn't look like an ice pond, would it? A. No, sir."

Appellee testified that when she went into the telegraph office she did not notice the floor at all.

The parties have cited numerous authorities which discussed and pronounce the law in cases of this character. They concede that the cases cited are not factually in point and since there is no dispute as to the applicable principles of law we refrain from analyzing those cases. For reference purposes, however, we cite Houston National Bank v. Adair, 146 Tex. 387, 207 S.W.2d 374, Rogers v. Collier, Tex.Civ.App., 223 S.W.2d 560 (San Antonio, writ ref.), and Walgreen-Texas Co. v. Shivers, 137 Tex. 493, 154 S.W.2d 625.

There is an abundance of testimony in the record from which the court could have made fact findings favorable to appellant. They were not, however, compelled as we believe the evidence which we have referred to demonstrates.

The negligence of appellant was not solely in waxing the floor but the manner in which this was done and the manner in which the floor was kept.

It is undeniable of course that the floor itself was obvious to appellee but it is not undeniable that the slippery or dangerous condition of the floor was open and obvious to her.

Having concluded that the fact findings of the trial court are sufficiently supported by the evidence we overrule the points under discussion.

■ The remaining point is, as we understand it, that appellee's expert witness, V. A. Westlake, was not qualified to express opinions regarding Franklin's 21 wax, the wax used by appellant.

Mr. Westlake testified that he had four college degrees, including a Bachelor of Science, a Civil Engineering degree, a B.A. and an M.A.; that he has had about 20 years' experience in the wax business, in which time he had handled various types of waxes and was familiar generally with the leading lines of waxes in the United States, nationally known brands, including Franklin's wax; that he had made a study of the different waxes and in that connection got the literature put out by the company on Franklin waxes; that he had also obtained information relative to Franklin's wax from Franklin salesmen, including information relative to its solid content and the type of wax; that he had been to a school which made a study of waxes and of the antislip properties in waxes; that he had supervised the waxing, or had waxed, thousands of floors in his business career and also sold wax removers and cleaners of various types; that he was familiar with and handled various types of floor coverings; that he had studied and read the literature, trade journals and similar materials relative to customary and proper methods of applying wax to floor in public places of business; that he had seen Franklin's wax applied to floors; that he could tell by the feel and smell and appearance of various types of waxes what sort of waxes they were and what their general contents were; that Franklin's 21 wax was a water emulsion wax and a liquid wax; that he had read certain information relative to the type of wax and its contents from advertisements and literature from Franklin's Wax Company.

Qualifications of an expert witness are left largely to the discretion of the trial judge. We find no abuse of this discretion in this instance. The point is overruled.

Finding no reversible error the judgment of the trial court is affirmed.

Affirmed.