**LIBERTY UNIVERSAL INSURANCE COMPANY, Appellant,**

v.

**W. C. GILL, Appellee.**

No. 14701.

Court of Civil Appeals of Texas.

Houston.

March 24, 1966.

Rehearing Denied April 14, 1966.

Fulbright, Crooker, Freeman, Bates & Jaworski, Sam H. Hood, Jr., and Gary B. Webb, Houston, for appellant.

Raymond L. McDermott and Mabel Grey Howell, Houston, for appellee.

WERLEIN, Justice.

This is a workman's compensation case. Appellee, W. C. Gill, sustained an accidental injury on September 6, 1962 as he was attempting to move a four-wheel, two-axle, tandem boat trailer, into his employer's shop. Based on the jury findings that appellee was totally and permanently disabled in response to Special Issues Nos. 1, 2 and 3, and the further finding that appellee was not partially disabled, the court entered judgment for permanent total compensation and also for the sum of $95.00, which the jury found would compensate appellee for reasonable expenses incurred by him for medical treatment which was required and which had not been paid by appellant.

Appellant asserts that the court erred in submitting Special Issue No. 3, which inquired whether the total disability of appellee was permanent, and in entering judgment on the jury's verdict, since there is no evidence that such disability is permanent. It also complains that the court erred in overruling its motion for new trial since such finding is so against the great weight and preponderance of the evidence as to be manifestly wrong.

Appellee testified that by trade he was a boat builder and carpenter, and that at the time of his injury he was a working foreman for Ralph Zinnecker Company, that he had only an eleventh grade education and had always made his livelihood with his hands and was not capable of doing any sales work or desk work or any similar work in which he could not use his hands. He was 53 years old at the time of the trial. Prior to his injury he did heavy labor and could lift weights of 100 to 150 pounds. On the occasion in question he was undertaking to move a metal trailer weighing 1200 to 1500 pounds. As he lifted the tongue of the trailer, the back wheels thereof which had been raised, fell to the ground, thus jerking him down and injuring his back. Next morning he could not get out of bed. Some five or six days later when he could get out of bed he went to Dr. Ashton, a chiropractor.

On or about October 11, 1962, he went back to work for his employer and remained until on or about March 8, 1963. During such time he could not lift anything and was in constant pain in his back and both of his legs. He was continuously growing worse. The evidence shows that all he attempted to do after returning to work was light work, and that finally after some five months he could not continue longer, and so notified the insurance adjuster, who referred him to Dr. Lane who officed with Dr. Brownhill. Dr. Brownhill, after treating appellee for some several months, operated on him March 13, 1963, for a large bulging protrusion of the disk between the fifth lumbar and the first sacral vertebrae,

which was causing pressure on the nerve roots and ligaments surrounding the disk.

After the operation Dr. Brownhill continued to treat appellee until on or about October 17, 1963. When Dr. Brownhill first saw appellee he prescribed a corset for him, which appellee wore continuously and was still wearing at the time of the trial. After the operation appellee was sent to the hospital on two more occasions because of persistent pain, severe headaches, weakness, and a discrepancy in the femoral pulses. Dr. Brownhill referred appellee to Dr. Henley, a cardio-vascular surgeon, who examined appellee and concluded that he should be hospitalized and that the vascular system in the lower extremities should be evaluated. Because of severe headaches he was sent to Dr. Peiper, who treated him for such condition.

The evidence shows that appellee has engaged in no heavy work such as he did prior to his injury, from the date thereof to the time of trial in March, 1965. Appellant in its brief points to the statement made by appellee that "Well, I can't do any job where I have to stand up continuously. I can't do anything—if I can sit for awhile and stand for awhile, but if I sit too long it bothers me real bad, and if I stand too long it is the same thing, but if I can alternate I can stay on the job for eight hours." Immediately following such statement he was interrogated as follows:

Q Doing what kind of work?

A Light work.

Q Can you do any heavy work at all?

A No, I can't.

Q Can you pick up and lift?

A No, I can't.

Q Can you climb, bend or stoop?

A No, not very well.

Q Do you know of any job that you could work on at this time eight hours a day, day in and day out, week in and week out?

A No, I don't.

The evidence further shows that when appellee went back to work his employer tried to avoid appellee's picking up anything heavy or handling sheet supply wood in an effort to make the work easier for him. His employer, Mr. Zinnecker, testified that he needed appellee even if he could do only light work and some overseeing; that appellee was not there regularly and on a sustained basis; that he complained of feeling bad and of headaches, etc.; that when he left the employment it was with the understanding that he always would have a job with him, Zinnecker, if he ever got to where he could feel like he could do a reasonable amount of work; and that "obviously from his own recognition of the situation and mine then he was not able to fulfill the job of foreman."

When he went back to work in June, 1963, Mr. Zinnecker told appellee that he could work as little or as much time as he pleased. The fact that appellee had worked for his employer more than five years on the last occasion prior to his injury and could return to such employment, if he was able to hold down the job even in the capacity of a foreman, is strong evidence that appellee was totally and permanently incapacitated and disqualified from performing the usual tasks of a workman in such a way as to enable him to both obtain and retain employment.

The evidence further shows that some two months after leaving his employment with Zinnecker Company he tried to help his wife run a lounge which she operated. There he did only light work although on a few occasions he lifted a case of beer. He had a helper working there at the lounge who generally handled all the cases of beer and did any heavy work of that kind. The evidence further shows that after the lounge was closed appellee went to work for Atkins & Merrill, Inc., being employed on or about June, 1964. During the time that he was there he did only light work, which

according to his testimony consisted of making small table models of Apollo, Ranger and Rocket missiles. Indeed, according to the testimony of a fellow employee, 90% of the work there was light work, and appellee was not called upon to do anything except the light work of making small models, which he did until on or about December 4, 1964, when the shop closed down for some days. Appellee was not called back to work by such company, because it could obtain employees with greater experience in the model building and repairing and displaying for the NASA program.

Dr. Martin A. Zionts, a medical doctor and a specialist in diagnosis and internal medicine, testified with respect to appellee's physical condition that the tests he made showed that the ligaments in the area of appellee's lumbosacral joint were having pressure put on them causing further stretching of the ligaments and pain in the nerve supply thereof, and also in the joint itself; that appellee has a weakening of the ligaments of the lumbosacral joint and unstable lumbosacral angle which adds to the weakness of the ligaments, and that he was having disability because of such fact; that while appellee had had some relief of pain in his legs, his low back pain and the instability of his low back has not improved; that he had helped appellee a little but had not restored him to a completely normal functioning back, and that in his professional opinion appellee in reasonable probability would never be so restored.

He also testified that appellee was able to do some things, but there are certain things, lifting, climbing, bending, standing on his feet for lengths of time, making sudden movements, walking over uneven ground, getting into awkward positions, bending and twisting, things like that, that he could not do. He might be able with impunity to do desk work, drive an elevator, perhaps a job where he could walk around, check supplies, and where he could sit down and rest every now and then, but that he was not able to do manual labor and labor involving the use of his back in all conditions, and that

such condition was, in reasonable probability, permanent. He further stated that he would not be able to take a job which involved doing manual labor of all sorts eight hours a day and five days a week, week in and week out. Asked to explain why appellee could not so work, he testified that appellee had an unstable back with weakened ligaments by reason of the original trauma, plus surgery, which causes pain, and such movements and lifting would put a greater strain on an already weakened area causing pain which is disabling; and that if he attempts to do such work, the chances are he will be laid up and have to stop work for a few days or a week. He also testified that appellee had marked restriction of movement of his hip, and some straight leg raising difficulties both on the right and left at varying times, which were objective symptoms which he could see; and that in medical probability his disability will probably get worse or it may remain static.

It is true that Dr. Brownhill, who operated on appellee's back, and who treated him for several months before the operation and for some four months thereafter, testified that it was his feeling that over a period of time with exercise appellee could gradually increase his work activity, and that he estimated appellee's disability at only about 5% in terms of his over-all capability. On the other hand, Dr. Ashton, appellee's chiropractor, testified, without objection being made, that in his opinion appellee would not be capable of holding down a job which would involve bending, stooping or climbing or lifting anything over twenty pounds, and that in his opinion such disability had continued since the date of the accident and was permanent. He further testified that in his opinion there was very little probability that appellee would ever be able to return to any regular sustained manual labor, and that if he went out and tried to work he would be right back in his office with a slippage of the vertebra causing pressure against the nerves.

In viewing the evidence most favorably to the verdict, we are of the opinion that there is evidence to support the finding that Mr. Gill is totally disabled to perform the usual tasks of a workman in such a way as to enable him to both obtain and retain employment, and that such total disability is permanent.

There is no fixed rule of evidence by which a claimant is required to establish the fact that he has suffered an injury causing permanent, total disability. See Traders & General Ins. Co. v. Daniel, Tex. Civ.App., 131 S.W.2d 276, dism., judg. cor. As stated in Employers Reinsurance Corp. v. Jones, Tex.Civ.App., 195 S.W.2d 810, writ ref., n. r. e., "The duration and extent of disability resulting from injury is at best an estimate which must be determined by a jury from all the pertinent facts before it." 63 Tex.Jur.2d p. 455, Sec. 429, and authorities cited.

After carefully reading the entire statement of facts and considering the evidence supporting the verdict and also that militating against it, we cannot say that the jury's findings are so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. In re King's Estate, 1951, 150 Tex. 662, 244 S. W.2d 660.

Appellant next complains that the district court erred in submitting to the jury its definition of "partial disability" and in failing to submit appellant's requested definition of "partial incapacity." The definition given by the court reads as follows: "By the term 'partial disability' as used in this charge, is meant any degree of disability to work less than total disability, as defined above."

The definition of partial disability follows immediately the definition of total disability in the court's charge. The court further instructed the jury that a person cannot be totally and partially disabled at the same time. However, a period of total disability may be followed by a period of partial disability; and conversely, a period of partial disability may be followed by a period of total disability.

The definition of partial incapacity requested by appellant is substantially the same as has been used in a number of Texas cases. Traders & General Ins. Co. v. Wright, Tex.Civ.App., 95 S.W.2d 753, aff'd 132 Tex. 172, 123 S.W.2d 314; Southern Underwriters v. Schoolcraft, 1942, 138 Tex. 323, 158 S.W.2d 991; Texas Employers' Insurance Association v. Hawkins, Tex.Civ. App., 387 S.W.2d 469, writ ref., n. r. e.

In Traders & General Insurance Co. v. Rockey, Tex.Civ.App., 278 S.W.2d 490, writ ref., n. r. e., the insurance carrier requested a definition of "partial incapacity" as meaning "any degree of incapacity less than total." The court said:

" * * * In our opinion, appellant's requested definition is more simple and less confusing than the one given by the trial court. Some courts have defined the term in very brief, simple language. In the case of Texas Employers' Insurance Association v. Brock [Tex.Com.App.], 36 S.W.2d 704, 705, the Commission of Appeals defined the said term as being 'any disability less than 100 per cent.' In the case of Texas Employers' Insurance Association v. Phelan, Tex.Civ.App., 103 S.W.2d 863, 865, this court said, ' "partial incapacity" obviously means less than "total incapacity." ' "

In Texas Employers Insurance Association v. Fowler, Tex.Civ.App., 140 S.W.2d 545, writ ref., the court held that the following definition of the term "partial incapacity" was not in the nature of a general charge:

" 'Partial incapacity, as that term is used in this charge or any special issue given you herein, shall have the following meaning: It shall mean any degree of incapacity to work, less than total incapacity, as defined herein. You are further instructed that a person cannot be totally and partially incapacitated at the same time. If the plaintiff was totally incapacitated to any

extent for any period of time, he could not be partially incapacitated for such period of time. Stating it the other way (meaning the same thing) if the plaintiff was partially incapacitated to any extent for any period of time, he could not be totally incapacitated for such period of time.'"

In Texas Employers' Ins. Ass'n v. Brock, Tex.Com.App., 36 S.W.2d 704, the insurance carrier requested and secured a definition of partial incapacity "to mean the ability to perform some of the duties of an ordinary workman; in other words, any disability less than 100 per cent." The court said:

"This instruction necessarily had the effect to modify and explain the definition given in the court's main charge of total incapacity, and the two instructions furnished the jury, with the correct rule by which to determine whether the defendant in error had suffered total incapacity, within the meaning of that phrase, as used in the statute."

■ Rule 277, Texas Rules of Civil Procedure, provides in part that the court shall submit such explanatory instructions and such definitions of legal terms as shall be necessary to enable the jury to properly pass upon and render a verdict upon the issues. In our opinion the definition of partial disability given by the court in connection with and immediately following the definition of permanent disability to which no objection was leveled, furnished the jury with the correct rule by which to determine whether appellee had suffered total or partial incapacity within the meaning of those phrases, as used in the statute.

Appellant complains that the court erred in admitting into evidence the narrative report of Dr. R. S. MacIntyre found in the hospital records at Methodist Hospital and in permitting Dr. Martin A. Zionts to read it and interpret it, and also erred in admitting the report of Dr. Walter S. Henley as part of the hospital records since both such reports allegedly consist of opinions, conclusions and diagnoses based upon medical examination or finding of conditions not obvious nor patently observable to persons generally.

In Martinez v. Williams, Tex.Civ.App., 312 S.W.2d 742, 749, no writ hist., this Court held that where the statement of a physician consisted of an opinion or conclusion or of a diagnosis based upon his medical examination or findings of conditions not obvious or patently observable to persons generally, the same should be excluded. In such case the doctor should be brought into the court where he might be cross-examined by opposing counsel.

We would be inclined to adhere to our opinion as handed down in Martinez v. Williams, but for the fact that we are of the opinion that the Supreme Court of Texas has foreclosed the issue contrary to our holding. In Rodriguez v. Travis Life Insurance Co., 1959, 160 Tex. 182, 328 S.W. 2d 434, the court said, with respect to Travis Life Insurance Co. v. Rodriguez, reported in Tex.Civ.App., 326 S.W.2d 256:

"The only point brought to this Court assigns error to the construction by the Court of Civil Appeals of Article 3737e, Vernon's Texas Civil Statutes. It is our view that the statute has been correctly construed by that court in its opinion published in 326 S.W.2d 256. Accordingly, the application for writ of error is refused. No reversible error."

We have carefully examined the opinion of the Austin Court of Civil Appeals in Travis Life Insurance Company v. Rodriguez. It seems clear to us that the court in construing Article 3737e, Vernon's Ann. Civ.St., held in effect that hospital reports of doctors giving their opinions and conclusions are admissible. The court in the footnote to its opinion stated that the authority of this Court to make the distinction

which we made in the Martinez case in interpreting and construing such article is not apparent to it, and that such distinction is criticized in Section 1262, McCormick & Ray, Texas Law of Evidence, 2d Ed., as follows:

" 'However, certain statements (such as psychiatric diagnosis) have encountered resistance in the federal courts and others because they rest on the maker's inference from data unusually difficult of interpretation, or upon "subjective symptoms" rather than on direct observation. Thus the entry "mental deficiency (organic brain disease)" has been rejected as the doctor's conclusion, an expert opinion based in part on hearsay. On the whole, however, it is believed that, even as to these controversial diagnoses, the majority view favoring admission is the more expedient one. It works for simplicity by making it unnecessary to draw a difficult line, itself provocative of doubt and dispute; it serves the modern policy of the free use of organizational records; and is not too burdensome on the adversary who may himself call the declarant and thus bring out, if he can, any weakness of the diagnosis.' "

The Austin court further said in the Rodriguez case:

"The 'hearsay' rule has many exceptions, most of which are court made. We know of no limitation upon the Legislature preventing it from creating an exception to the hearsay rule in civil cases. We believe that this is exactly what the Legislature did when it enacted Art. 3737e. We believe it is a valid statute and one which the courts should enforce."

The court further said that it was its opinion that Article 3737e should be interpreted and construed so as to authorize the admission in evidence of the hospital records, including the diagnosis of Leukemia.

Had the Supreme Court merely refused a writ, n. r. e., in the Rodriguez case,

we would be inclined to follow our opinion in the Martinez case. However, in view of the Supreme Court's per curiam opinion stating that it was its view that the statute had been correctly construed by the Austin court in its opinion, and further in view of the broad construction placed upon the statute by the Austin Court of Civil Appeals, and its apparent approval of the foregoing statement made by McCormick & Ray, we are of the opinion that the Supreme Court has in effect held that Article 3737e should be so construed as to admit in evidence without limitation medical reports included in the hospital records, made by doctors from their examination of the patient in the hospital although such reports consist of their opinions, conclusions and diagnoses. See Texas Employers' Insurance Ass'n v. Dennis, Tex.Civ.App., 372 S.W.2d 559, writ ref., n. r. e.; Skillern & Sons v. Rosen, Tex.Sup.1962, 359 S.W.2d 298.

Appellant asserts that the trial court erred in permitting Dr. Ashton to give opinion evidence with respect to neurological and surgical matters. Dr. Ashton is a well qualified and experienced chiropractor. We have carefully examined his testimony, and do not find that he was permitted to give an opinion in the field of surgery. At one point in his testimony when he was beginning to explain surgical processes with respect to the vertebrae, an objection was made by appellant which was sustained by the court. He made no claim to know anything about surgery. In our opinion he was qualified to give opinion evidence with respect to the mechanical restoration of displaced or subluxated vertebrae and the adjustment thereof to relieve pressure on nerves emanating from the spinal column, and to testify with respect thereto. It is our view that the court did not err in admitting such testimony. Furthermore, appellant has not complained that the trial court abused its discretion in permitting the introduction of such evidence. The law is well settled that the trial judge possesses wide discretion in determining the

qualifications of an expert witness giving opinion evidence, and that such testimony will not be disturbed by the appellate court in the absence of a clear showing of abuse of discretion. Rayburn v. Giles, Tex.Civ. App., 182 S.W.2d 9, writ ref.; Aetna Ins. Co. v. Collins, Tex.Civ.App., 134 S.W.2d 709; Jones v. Elliott, Tex.Civ.App., 259 S. W.2d 288, writ ref.; Western Union Tel. Co. v. McDavitt, Tex.Civ.App., 257 S.W.2d 319, writ ref., n. r. e.; McCormick & Ray, Texas Law of Evidence, Vol. 2, p. 235, § 1401.

Appellant next complains that the trial court erred in refusing to grant appellant's motion for mistrial because of the following argument made by appellee's counsel:

"You have heard what this compensation law provides, which is part of the proof His Honor has permitted you to hear, $35.00 per week, and when you realize the amount involved I think you can realize how important it is that we have no compromise verdict in this law suit, because I defy any man or woman in this day and time to live on $35.00 per week."

■ The court in passing upon appellant's motion in limine specifically allowed appellee to show that he was paid only $35.00 per week during the time he was paid compensation for the sole purpose of showing the economic necessity of returning to work. Appellee testified that during the time he was not working he was paid $35.00 per week compensation. Appellee's attorney did not state in his argument for what period of time compensation in the sum of $35.00 per week would be paid. It is our opinion that there is no reversible error in the court refusing to grant a mistrial because of the aforesaid argument. Nothing was said that the jury did not already know, so that no harm could result from such argument. Rule 434, T.R.C.P. Moreover, if improper, such argument was not of the

incurable type. At the time the argument was made appellant's counsel objected thereto as being improper and the court sustained the objection and instructed the jury not to consider the statement. Texas Employers Insurance Ass'n v. Mendenhall, Tex.Civ.App., 334 S.W.2d 850, writ ref., n. r. e.; Transport Insurance Co. v. Nunn, Tex.Civ.App., 375 S.W.2d 484, writ ref., n. r. e.

■ We sustain appellant's seventh, eighth, ninth, tenth and eleventh points of error which relate to alleged error in submitting Special Issue No. 10 inquiring as to the amount of the unpaid bill of Dr. Martin A. Zionts, and in entering judgment for $95.00 on the jury's answer thereto, since there is no evidence or finding by the jury that appellant refused, failed or neglected to furnish appellee medical care or treatment. The evidence shows that appellant furnshed medical care whenever requested to do so. Appellee testified that appellant had never refused to send him to any other doctor or give him any treatment he asked for, and that appellant had honored every request appellee had ever made for medical treatment. Appellee also testified that when he last saw Dr. Brownhill in October, 1963, the doctor said there was nothing else he could do. He never refused to see or treat appellee. Such testimony did not constitute any evidence more than a scintilla that appellant refused, failed or neglected to furnish medical treatment. It certainly did not establish such fact as a matter of law. Appellee failed to obtain a jury finding which would entitle him to recover under the provisions of Article 8306, Sec. 7, V.A.T.S.

The judgment of the trial court is reformed by omitting from the amount of recovery the sum of $95.00 for medical expenses, and as reformed is affirmed.

Reformed and affirmed.